**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**LOCAL 239, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, Respondent.**

No. 284, Docket 29212.

United States Court of Appeals
Second Circuit.

Argued Jan. 12, 1965.

Decided Jan. 27, 1965.

Richard S. Rodin, Attorney, National Labor Relations Board (Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, Stephen B. Goldberg and Glen M. Bendixsen, NLRB, on the brief), for petitioner.

Charles R. Katz, of Katz & Wolchok, New York City, for respondent.

Before SMITH, KAUFMAN and ANDERSON, Circuit Judges.

SMITH, Circuit Judge.

The National Labor Relations Board petitions the court for enforcement of its order of May 19, 1964, 147 NLRB No. 4, requiring Local 239, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America to halt recognitional or organizational picketing of Abbey Auto Parts Corp., Bethpage, Long Island, New York, in violation of Section 8(b) (7) (B)[1] of the National Labor Relations Act, as amended (61 Stat. 136, 73 Stat. 519, 29 U.S.C. § 151 et seq.) and to post appropriate notices. We find the order invalid because not based on substantial evidence on the record as a whole, and deny the petition for enforcement.

Abbey Auto Parts Corporation (Abbey) with nine employees, and Bethpage Auto Parts, Inc. (Bethpage) with two employees, had withdrawn from a multi-employer collective bargaining arrangement with the Union a sufficient time prior to the signing of a new agreement with the other employers. Shortly thereafter, in April 1962, Abbey and Bethpage pursuant to Section 9(c) (1) (B) of the NLRA filed individual petitions with the Board asserting their timely withdrawal from the multi-employer unit and requesting elections to determine union representation. The Board agreed and on April 15, 1963 ordered elections. A week prior to the date set for elections at Abbey the Union sent the company a letter wherein it stated that it would picket the premises for the purpose of informing the public that the establishment was non-union, but would not in any way interfere with Abbey's business and was not at all interested in organizing Abbey's employees, the Union's purpose being only to protect union interests in the general area. Picketing commenced on May 6, 1963 with the Union representatives carrying two types of placards, one of which read,

To the Public
Please Be Advised
Abbey Auto Parts
is
Non-Union
This Jeopardizes our Union Standards
Please Do Not Patronize
Local 239, IBT

and the other,

Don't Buy at Abbey
Non-Union
Local 239, Teamsters

1. "(b) It shall be an unfair labor practice for a labor organization or its agents—
 "(7) to picket or cause to be picketed, or threaten to picket or cause to be picketed, any employer where an object thereof is forcing or requiring an employer to recognize or bargain with a labor organization as the representative of his employees, or forcing or requiring the employees of an employer to accept or select such labor organization as their collective bargaining representative, unless such labor organization is currently certified as the representative of such employees:
 "(B) where within the preceding twelve months a valid election under section 159(c) of this title has been conducted."

The Union also distributed handbills to Abbey customers as they entered an adjacent parking lot. On May 10, 1963, the Union resoundingly lost the election.

The picketing and handbilling continued after the election, and in addition many of Abbey's customers were approached and requested not to do business with Abbey. In the meantime the election had not yet been held at Bethpage, and the Union commenced picketing around that establishment with signs identical to those used at Abbey except for the name, and an identical letter was sent to the Bethpage management. On July 3, Bethpage's employees also voted the Union down; however, the picketing continued as it had at Abbey. But Bethpage and the Union reached an accord and entered into an agreement about a month later after picket Lewis Sherman, the brother of the Local's president, informed Bethpage that a possible way to eliminate the picketing would be to sit down and meet with the Union.

After the agreement was signed by Bethpage, Lewis Sherman was assigned to the Abbey picket line. Abbey's president claimed that Sherman, while present at Abbey, approached him and told him that unless Abbey sat down with the Union, as Bethpage had done, the Union would never leave Abbey alone. Meanwhile, on May 29 Abbey had filed unfair labor practice charges against the Union alleging that the Union's picketing violated § 8(b) (7) (B) of the Act.

The Trial Examiner found that the Union engaged in unfair labor practices within the meaning of § 8(b) (7) (B) by picketing Abbey for recognitional and organizational purposes at a time when a valid election under § 9(c) had been conducted within the preceding twelve months. The Board adopted the Trial Examiner's findings, conclusions and recommendations.

The Examiner relied on Sherman's statement, on the withdrawal of pickets at Bethpage after agreement was reach-ed, and on the language of one of the picket signs, "Don't buy at Abbey. Non-Union. Local 239, Teamsters." The Examiner found that Bethpage was located directly across the street from Abbey. The Board concedes that this was error, since the two shops are actually more than a mile apart, but held that the error had no effect on the correctness of the decision or its concurrence therein.

As against this evidence, it is uncontroverted that in a letter of May 3, 1963 the Union declared its purpose in the picketing to be informational and not recognitional, and promised to correct any violation of instructions by pickets promptly on being advised. The Union enclosed a copy of its instructions to pickets to patrol peaceably in front of consumer entrances only, and not to have any employees stop work or any deliveries interrupted. The only instance of violation of instructions was the claimed statement by Sherman, who, although a brother of the Local's president, was not an officer of the Union, but a hired picket on his first such employment in the Bethpage and Abbey picketing. There was no interference with deliveries or with Abbey's employees. No report was made to the Union of Sherman's claimed violation of instructions. When a Union member making delivery by truck refused to cross the picket line, a picket reported to a representative of the Local, who came and told the driver to make the delivery. The picketing of Abbey lasted more than 100 days. Some 70 customers of Abbey were visited by Union representatives.

The Sherman incident was the sole occurrence in even arguably union activity which could be said to give a recognitional color to the picketing. While a union may be bound by actions of its agents other than its elected officers,[2] we should be hard put to find any such agency here. The other facts relied on are similarly weak. The use of the

2. New Power Wire & Electric Corp. & P. & L. Services, Inc. v. NLRB—NLRB v. Local 3, 2 Cir., 340 F.2d 71.

term "non-union" on the signs was thought by the Examiner to show a desire to change Abbey's status from non-union to union and so recognitional. We cannot agree. While it is of course true that any effort to divert business from non-union to union shops has some tendency to make an employer consider the advisability of unionizing, it is not so directly aimed to that end as to support a finding of forcing or requiring an employer to recognize or bargain, and so a § 8(b) (7) violation. Language similar to that used here has been held to be within the exemption of § 8(b) (7) (C) and therefore could not serve as evidence of an illegal purpose. McLeod v. Chefs Local 89, 280 F.2d 760, 2 Cir. 1960; N. L. R. B. v. Local 3, IBEW, 317 F.2d 193, 2 Cir. 1963. While this is an 8(b) (7) (B) case, the same tests must be applied in determining whether picketing is solely informational, an exercise of the right of free speech, or whether an object thereof is the forbidden one of forcing or requiring an employer to recognize or bargain.

The evidence of the Union's effort, generally successful, to keep the picketing of Abbey on an informational rather than coercive plane far outweighs that relied on by the Board. We cannot find that the Board's conclusions were based on substantial evidence on the record as a whole. Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 479, 71 S.Ct. 456, 95 L.Ed. 456 (1951); Federation of Union Representatives v. N. L. R. B., 339 F.2d 126, 2 Cir. 1964 (11/20/64).

The petition for enforcement of the Board's order is denied.